In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 05-4681

JOSEPH R. GRIEVESON,

*Plaintiff-Appellant,*

*v.*

FRANK J. ANDERSON,[1] Marion County
Sheriff, PATRICK COMMISKEY, CHRIS
BOOMERSHINE, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 02 C 1862—**John Daniel Tinder**, *Judge.*

_____

ARGUED SEPTEMBER 21, 2007—DECIDED AUGUST 18, 2008

_____


Before EASTERBROOK, *Chief Judge*, and KANNE and
ROVNER, *Circuit Judges*.

KANNE, *Circuit Judge*. During Joseph Grieveson's de-
tainment at the Marion County, Indiana, Jail, he allegedly

_____

[1] At the time this suit was filed, Jack Cottey was the Sheriff of
Marion County. Frank Anderson is the current Sheriff, and
Anderson is automatically substituted as the defendant
under Federal Rule of Appellate Procedure 43(c).

suffered several attacks at the hands of other inmates, and one attack by an unnamed jail guard. He brought suit against numerous government defendants in their individual and official capacities, raising constitutional and state-law claims. The United States District Court for the Southern District of Indiana dismissed some of the claims and granted summary judgment in favor of the defendants for the remaining claims. We affirm the district court's grant of summary judgment in favor of the Marion County Sheriff on the official-capacity claims. However, with respect to the individual-capacity claims against individual defendants, we affirm in part and reverse in part. There is a genuine issue of material fact surrounding whether one jail guard was deliberately indifferent to Grieveson's safety needs, and there is a genuine issue of material fact about whether three jail guards were deliberately indifferent to Grieveson's medical needs. Finally, we reverse the district court's disposition of Grieveson's negligence claims against certain defendants under Indiana law.

## I. History

We review the district court's entry of summary judgment in favor of the defendants *de novo*. *See Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003). Given this standard of review, we must construe all inferences in favor of the nonmoving party, in this case Grieveson, *id.*, and recount the facts in the light most favorable to him, *Steen v. Myers*, 486 F.3d 1017, 1019 (7th Cir. 2007).

For about eleven months between May 2000 and January 2002, Grieveson, a Canadian citizen, was a federal pretrial detainee being held at the Marion County Jail on

charges of illegal reentry of a deported alien. During the first six months of his tenure at the jail in Indianapolis, Grieveson shared a four-person cell with Art Schlichter, a former quarterback for the Indianapolis Colts. During that same time period, a federal grand jury in Indianapolis was investigating Schlichter's ongoing involvement in gambling schemes—particularly schemes involving Linda Wagoner, Schlichter's attorney, who was allegedly smuggling items into the jail for Schlichter. One of Grieveson's friends on the outside, Norman Buff, was "involved with the Grand Jury in catching [Wagoner]." Out of concern for Grieveson, Buff had spoken with Sergeant Chris Boomershine on several occasions to request that Grieveson be moved to another location within the jail. Grieveson believed that he was considered a "snitch" within the jail because of his association with Buff.

Grieveson was moved out of Schlichter's cell on November 18, 2000, into a large "barracks-style" area that housed approximately 45 inmates. Shortly thereafter, on November 30, Grieveson was beaten unconscious by another inmate. Grieveson states that throughout the beating, the aggressor called Grieveson a "snitch" and said the beating was a "favor for Schlichter." The next day around noon, Grieveson told Officer Smith that his nose was broken, that he was bleeding down his throat, and that he was in intense pain. Smith responded that she would "let 'Medical' know." Grieveson proceeded that afternoon to tell defendants, Officers Cornell, Duncan, and Highbaugh, of his injuries, but he did not receive any medical assistance. Even Grieveson's sister called the jail to urge them to provide Grieveson with medical care. Then, on December 2, Grieveson complained of his injuries again to Offi-

cer Duncan; she had Grieveson fill out a "medical call card."

On December 3, Grieveson was taken to the hospital, where it was confirmed that he had a broken nose. He was prescribed pain medication and advised to meet with a plastic surgeon. When back at the jail, Grieveson requested his prescribed medication, but a jail guard refused to give it to him, saying, "You don't need it. Be a man and stop whining." Eventually, Grieveson was given all of his prescribed pain killers at once. A stronger prisoner took the medication away from him, and as a result, Grieveson was left without medication for a week. Grieveson submitted a timely grievance to jail officials, reporting the delays of Officers Cornell, Duncan, and Highbaugh in obtaining medical help for him after his injuries. The jail's response stated, "it is unfortunant [sic] that it took that long to send you to [W]ishard . . . ." The jail disposed of the grievance as "ujs" (presumably meaning unjustified).

Grieveson suffered a second inmate attack on December 31, 2000. The jail's activity report states that Grieveson said he had "slipp[ed] in puddled water." But Grieveson avows that when he was alone with the officers, he told them he had been assaulted and that he wanted to be moved to a different cell block. At one point after the December 31 assault, Grieveson requested that he receive only one dose of medication at a time—instead of his entire prescription at once. A jail medical record dated January 9, 2001, confirms that Grieveson made a request for intermittent disbursements of his prescription medication.

On or about January 17, 2001, Grieveson suffered a third attack by another inmate. Grieveson alleges that two

days passed before he was taken to the hospital—on January 19, 2001—and medical attention came only after his family members made numerous calls to the jail about his injuries. The jail activity records indicate that Grieveson suffered the injuries on January 19. In addition to bruising and bleeding injuries, Grieveson's tooth was broken during this assault, and he had to have it surgically removed. Grieveson reported that he "layed [sic] there with my face beaten in for two (2) days in severe pain and suffering before receiving medical treatment." Grieveson filed a grievance about the third attack, again stating that his medical treatment was unduly delayed. The response from the jail was: "this is an unfortunant [sic] situation but you did go and get your tooth fixed at [W]ishard. [T]he medical office sees a lot of inmates on any given day and sometimes they do miss some." Again, the disposition was "ujs" (unjustified). Grieveson was given his entire prescription of pain medication at one time—only to have it stolen by another inmate.

Grieveson's fourth set of injuries—on January 22, 2001—allegedly came after a jail guard slammed Grieveson's arm in a steel door and threw him repeatedly against the bars in a basement holding cell. Apparently the guard told Grieveson to stop complaining and stop "causing trouble." Grieveson was taken to the hospital, where he was treated for a shoulder injury. He was prescribed pain medication and told that initial treatment included applying cold packs to the injury. At the jail, Grieveson requested ice packs but jail officials told him, "we don't give those out here." The jail guards again gave Grieveson his entire prescription of pain medicine at one time. The medicine was again stolen from Grieveson by another inmate.

In early February 2001, Grieveson was assaulted by another inmate who "pummeled" him in the face because he was snoring. And then in early March, Grieveson was assaulted for the sixth time, after he tried to defend his food and other personal items from other inmates. Grieveson alleges that Officer Highbaugh witnessed the sixth assault, and later told Grieveson "to learn how to fight harder or don't come to jail." On March 6, Grieveson told a jail medical officer that he had been in an "altercation" two days before. He complained of pain in his ribs and arm.

On March 14, 2001, Grieveson filed a grievance with the jail about his assaults in general and his fears. He specifically asked to be moved to a safer block:

> As you know I have been beaten and assaulted over 6 times and [through] no fault of mine. I am real scared of my life in here and the guards are even afraid to come into the block[.] How do you think we fell[?] I feel like I am [losing] my mind in here and going to have a breakdown. I ask you to move me to another jail or at the least move me to a safer block.

At the same time, Grieveson's friend, Buff, was also trying to secure Grieveson relocation. In March, Buff spoke with Officer Boomershine in person and explained that he feared for Grieveson's safety and he urged Boomershine to relocate Grieveson.

The seventh attack Grieveson suffered, on March 21, 2001, was by far the worst. A fellow inmate, Robert White, hit Grieveson in the face and slammed his face into a steel table, knocking Grieveson unconscious. Grieveson stated in an affidavit that at the time of the attack, White "was angry over losing in a card game." Once

he woke up, Grieveson waited 90 minutes until a guard was within shouting range. He also called his sister to ask her to call for help. Grieveson suffered serious injuries including a broken left eye socket, damage to his optic nerve, and injuries to his ribs, face, jaw, and nose. The attacker was allegedly a former client of Wagoner, Schlichter's attorney. Grieveson first told the jail guards that he slipped in the shower, but when he was out of the earshot of other inmates, he claims he told them he was attacked.

Grieveson saw a plastic surgeon on March 28, 2001, and was told that he needed immediate surgery to correct the damage to his eye. Surgery was scheduled for some point in the next few days, but Grieveson was not told the exact day and time of the surgery. Unfortunately, Grieveson did not have surgery as originally scheduled because on March 30, 2001, he was moved from Marion County Jail to Park County Jail, and then to the Federal Medical Center in Minnesota (FMC). In the process of the moves, Grieveson's medical records were not supplied immediately to the new detention facilities. When the FMC did receive his medical records—approximately 35 days after Grieveson left the Marion County Jail—it was as a result of Grieveson's attorneys' efforts to have them forwarded. According to Grieveson, by the time he saw another doctor about his eye, it was too late to correct the damage.

When Grieveson returned to the Marion County Jail approximately nine months later, he had a prescription for pain medicine. He alleged that he was given, at one time, an entire bottle of 100 pills of Ultram—a prescription, narcotic-like pain reliever. *See* webmd.com, Ultram Oral, http://www.webmd.com/drugs/drug-11276-Ultra

m+Oral.aspx?drugid=11276&drugname=Ultram+Oral (last
visited Aug. 8, 2008). Two inmates stole the pills from
Grieveson, slapping his mouth in the process. Grieveson
did not put up a fight and questioned why "medical
staff and jail guards [would] give an inmate in jail with
45 other inmates . . . about 100 pain pills knowing [the
recipient] was in severe pain wearing a patch over [his]
left eye and knowing [he] had no way of locking up
anything."

Grieveson was convicted and placed in federal prison to
serve out his sentence. Grieveson brought suit against
various defendants including the Marion County Sheriff;
Marion County Jail Commander Patrick Commiskey;
Marion County Sergeant Chris Boomershine; Marion
County Jail Officers Highbaugh, Cornell, and Duncan; and
United States Marshal Frank Anderson, in their official
and individual capacities, as well as the City of Indianapo-
lis.[2] The action combined state-law negligence and con-
stitutional claims, and federal claims under 42 U.S.C.
§ 1983 and 28 U.S.C. § 1350 (the Alien Tort Claims Act). The
United States District Court for the Southern District
of Indiana dismissed some claims and granted summary
judgment in favor of the defendants on the remaining
claims. This appeal ensued.

---

[2] Grieveson initially brought two suits against two groups of
defendants—one in state court, the other in federal court. The
state court suit was removed to federal court and the cases
were consolidated. The claims against Frank Anderson in his
individual capacity and those against the City of Indianapolis
were dismissed before the summary judgment stage in a
May 25, 2004 order, and are not at issue in this appeal.

## II. ANALYSIS

On appeal, Grieveson argues that the district court's opinion was fundamentally flawed and that, consequently, we should reverse summary judgment and remand for further proceedings. He also challenges the district court's resolution of his official- and individual-capacity claims, arguing that his Eighth Amendment rights were violated both by the unconstitutional customs and practices of the Marion County Jail, and by the deliberate indifference of jail officers to his safety and medical needs. Finally, Grieveson argues that the district court erred by granting summary judgment to the defendants on his state-law negligence claims.

### A. Sufficiency of the District Court Opinion

Because we are reviewing the district court's decision *de novo* and we decide the merits of Grieveson's substantive arguments, it is not necessary for us to respond to Grieveson's technical challenges to the district court's opinion. *See Smith v. Potter*, 445 F.3d 1000, 1009 n.20 (7th Cir. 2006) ("[W]e need not resolve this issue to dispose of [the] appeal . . . ."); *see also Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008).

Grieveson does, however, raise a valid point concerning the district court's dismissal of the official-capacity claims against the Marion County Sheriff. The district court stated that the previous "dismissal of claims against the City of Indianapolis also put[ ] to rest claims against the defendant individuals in their official capacities." In so deciding, the district court may have conflated the City of Indianapolis and the Marion County Sheriff's Department, viewing them as the same governmental

entity. Such a mixup is understandable in light of the evolving consolidation status of the City of Indianapolis and Marion County, and their law enforcement divisions. *See* IMPD History, http://www.indygov.org/eGov/IMPD/About/History/home.htm, last visited Aug. 8, 2008; *see also* Ind. Code §§ 36-3-1-1 to 36-3-4-24; *Scott v. Consol. City of Indianapolis*, 833 N.E.2d 1094, 1100 (Ind. Ct. App. 2005).

But the consolidation of the City and County, as well as the consolidation of their law enforcement departments, has been only partial—the Jail Division of the Marion County Sheriff's Department has not merged with the City of Indianapolis Police Department. *See* City-County General Ordinance No. 100, § 281-612 (2005). Further, the Sheriff's Department has always remained a separate entity from the City of Indianapolis. Therefore, the dismissal of the City of Indianapolis in Grieveson's litigation did not effectuate the dismissal of Grieveson's official-capacity claims against the Marion County Sheriff. Even though the district court dismissed claims against the Sheriff in his official capacity, it also decided that, as a matter of law, "the pleadings and evidentiary record here do not support a claim of municipal liability." We will analyze that decision *de novo*, and turn now to the official-capacity claims.

### B. *Section 1983 Official-Capacity Claims*

Grieveson's claims against the Sheriff in his official capacity are treated as claims against Marion County itself. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006). Governmental entities cannot be held liable for the unconstitutional acts of their employees unless those

acts were carried out pursuant to an official custom or policy. *Id. See also Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 694 (1978). "The 'official policy' requirement for liability under § 1983 is to 'distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.' " *Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). *See also Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) ("Misbehaving employees are responsible for their own conduct, 'units of local government are responsible only for their policies rather than misconduct by their workers.' " (quoting *Fairley v. Fermaint*, 482 F.3d 897, 904 (7th Cir. 2007))).

In order to survive summary judgment on a § 1983 official-capacity claim, the plaintiff must present evidence demonstrating the existence of an "official policy, widespread custom, or deliberate act of a county decision-maker of the municipality or department." *Wagner v. Washington County*, 493 F.3d 833, 836 (7th Cir. 2007). Further, the plaintiff must show that the official policy or custom was the *cause* of the alleged constitutional violation—the " 'moving force' behind it." *Estate of Sims*, 506 F.3d at 514 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)).

Grieveson contends that in spite of the jail's formal written grievance policy, the *actual* grievance process was a sham and provided no effective way for inmates to communicate their safety concerns, complaints, and fears to jail officials. According to Grieveson, the absence of an adequate grievance procedure left him more susceptible to assaults and thus deprived him of his Eighth Amend-

ment right to be free from cruel and unusual punishments. *See* U.S. Const. amend. VIII. Grieveson also points to the jail's method of dispensing prescription medicine as an official policy or custom that violated his constitutional rights by placing him at a direct risk of harm.

Grieveson means to argue under the Due Process Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, because he was a pre-trial detainee while at the Marion County Jail and was therefore not subject to punishment at all. *See Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005); *see also Guzman v. Sheahan*, 495 F.3d 852, 856 (7th Cir. 2007). Either way, the inquiry under both provisions of the Constitution is essentially the same. *Id.; Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000) (noting that there is "little practical difference between the two standards."); *Henderson v. Sheahan*, 196 F.3d 839, 844 n.2 (7th Cir. 1999).

### 1.  The Jail's Grievance Procedure

The posture of Grieveson's grievance-procedure argument is that the Marion County Jail's grievance process itself "*consciously created* the conditions in which harm was almost certain to occur." (emphasis in Grieveson's brief). He believes that "the jail's illusory grievance process was directly responsible for the constitutional deprivations he suffered when he was brutally assaulted multiple times . . . ." Grieveson has to take this stance in order to maintain a § 1983 claim against the Sheriff in his official capacity, because there must be a "direct causal link between a policy or custom of the Sheriff's Department and the alleged constitutional violations." *Estate of Sims*, 506 F.3d at 515 (citing *City of Canton*, 489 U.S. at 385). Grieveson's position also seems necessary in light of our

case law specifically denouncing a Fourteenth Amendment substantive due-process right to an inmate grievance procedure. *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996) ("With respect to the Due Process Clause, any right to a grievance procedure is a procedural right, not a substantive one. Accordingly, a state's inmate grievance procedures do not give rise to a liberty interest protected by the Due Process Clause." (internal citations omitted)).[3] To describe Grieveson's contention more succinctly, he argues: (1) he suffered beatings at the hands of other prisoners; (2) the jail had an ineffective grievance procedure; (3) the grievance procedure caused the beatings.

The weakness of Grieveson's argument has less to do with evidence than with logic. He argues that *because of* the ineffective grievance procedure, prisoners beat him. But it is impossible to see how Grieveson's A causes his B. If Grieveson showed a prison policy or custom that effectively allowed prisoners to beat one another, he might have had a successful claim against the County. Or, if he demonstrated that there was absolutely no opportunity for prisoners to express their safety concerns to jail officials, perhaps he could prevail. But, the evid-

---

[3] Grieveson acknowledges that there is no substantive liberty interest in a *bona fide* prison grievance process, *see Antonelli*, 81 F.3d at 1430, but he notes that there is a procedural right. However, the procedural right is of no use to Grieveson, because it exists to ensure that prisoners and detainees can access the courts. *See id.* Grieveson makes no claim that the grievance procedure as implemented prevented him from accessing the courts. *See id.* ("Mr. Antonelli's invocation of the judicial process indicates that the prison has not infringed his First Amendment right to petition the government for a redress of grievances.").

ence here shows that Grieveson had opportunities to verbally express his fears and concerns to jail officials, and that he did so on several occasions (*e.g.*, "I did inform the Defendants [I had a problem] on the trips to the hospital"). Grieveson is trying to shoehorn a claim for deliberate indifference of particular jail officials into an official-capacity claim by pointing to a prison policy that has no causal connection to the harms Grieveson suffered at the hands of other inmates. Seeing as the jail did not have to employ any grievance procedure whatsoever under the Fourteenth Amendment, *see id.*, it is hard to understand how the implementation of one—even one that did not function perfectly—would actually *cause* prisoner beatings. It is only " 'when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983.' " *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (quoting *Estate of Novack ex rel. v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000)).

Grieveson has not presented any evidence showing that the Marion County Jail's grievance procedure—the formal policy itself and the allegedly "sham" manner in which it was carried out—caused his injuries. *See Estate of Sims*, 506 F.3d at 515. This § 1983 official-capacity claim against the Sheriff fails for lack of causation. *See Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("At any rate, we fail to see how the report-filing policy or practice was likely to lead to [the inmate's] death."); *Butera v. Cottey*, 285 F.3d 601, 608 (7th Cir. 2002) ("However, Butera has failed to show how the Sheriff's policies caused these activities because even if there were 24-hour video surveillance of the cellblocks, detainees could still dim the lights or hide under blankets.").

2.   The Jail's Method of Dispensing Prescription Medication

The other official practice Grieveson challenges is the method by which the Marion County Jail dispensed prescription medications. He argues that the jail maintained a customary practice of "failing to control inmate prescriptions" such that inmates were given entire bottles of medication at once. Grieveson attests that he had his medications stolen from him by other inmates at least four times.

To survive summary judgment on this official-capacity claim against the Sheriff, Grieveson again has to present evidence demonstrating that the method of prescription distribution was undertaken pursuant to an official jail policy or widespread custom. *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002). Grieveson must point to "either an express policy which caused the injury, a widespread practice that is so well-settled as to amount to a policy, or [show] that the sheriff had the final policymaking authority for the decisions regarding the medical treatment [he] received.*" Id.* He must also present evidence demonstrating that the method of prescription dispensing amounts to an unconstitutional practice. *See Antonelli*, 81 F.3d at 1427; *see also Calhoun v. Ramsey*, 408 F.3d 375, 381 (7th Cir. 2005) (stating the inquiry into official-capacity liability to be whether the County employs an "impermissible" method of operation).

Grieveson makes a widespread custom argument—that jail officials would give out an inmate's entire prescription at one time, in full view of other prisoners, placing in harm's way the prisoner with the prescription. Grieveson specifies in his affidavits four instances in which jail guards gave him his entire prescription at

once, and he explains the consequences he suffered as a result (*e.g.*, "On January 2, 2002, the medication that was given to me (Ultram) was taken from me with force (100 pills). Yes, a trained medical staff and officers gave me the whole bottle of pain medication to keep with me in the cell-block. I was slapped in the mouth then the medication was taken by two other inmates, this time I never put up any fight."). A January 9, 2001 jail medical record shows that Grieveson complained about the method of prescription dispensing, and asked for his pills one at a time. Grieveson does not, however, present any evidence relating to inmates other than himself, aside from the general statement in his June 30, 2004 affidavit:

> If and when a prisoner was prescribed a medication, pain pills, etc., even a narcotic, the jail staff—not the medical staff— would pass out the medication (narcotics) in front of all the prisoners to see who got what. And Defendants would give the prisoner the whole prescription at times, sometimes the whole bottle of pills . . . .

The question then is whether Grieveson provided "enough evidence of custom and practice to permit an inference that the County has chosen an impermissible way of operating." *Calhoun*, 408 F.3d at 381. A practice of dispensing full bottles of prescription medicine to inmates may be an impermissible manner of operating under the Constitution—though Grieveson did not present expert evidence or caselaw addressing the effects of dispensing entire drug prescriptions at once. From the little we know, the alleged practice provides inmates with quantities of medicine that could potentially allow them to overdose and that could place them at risk for having their needed medication stolen. But we need not

decide whether the practice is unconstitutional, because Grieveson has not put forth adequate evidence showing that the alleged practice was widespread and reflective of a policy choice by the Marion County Sheriff, which is the pivotal requirement of a § 1983 official capacity claim. *See id; Phelan v. Cook County*, 463 F.3d 773, 789-90 (7th Cir. 2006).

Grieveson's allegation about jail officers providing full prescriptions to other prisoners does not indicate the frequency of the practice, nor suggest that it is widespread. We do not know the alleged number of inmates involved, and we do not know how many such disbursements Grieveson witnessed. One broad, vague statement about an occurrence affecting other inmates in a detention facility does not support the inference of a "widespread" custom. *See Phelan v. Cook County*, 463 F.3d 773, 789-90 (7th Cir. 2006) ("The unifying theme in these decisions is the acknowledgment that the word 'widespread' must be taken seriously.").

Turning to Grieveson's personal experiences, we note that it is not impossible for a plaintiff to demonstrate the existence of an official policy or custom by presenting evidence limited to his experience. *Id.* ("Generally speaking, we do not believe that a plaintiff should be foreclosed from pursuing Section 1983 claims where she can demonstrate that repeated actions directed at her truly evince the existence of a policy."). However, it is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his own experience because " 'what is needed is evidence that there is a true municipal policy at issue, not a random event.' " *Id.* (quoting *Calhoun*, 408 F.3d at 380).

In his pleadings, discovery and disclosure materials, and affidavits, Grieveson presented four incidents in

which he was given his full prescription at one time, and a medical record shows that he asked, on one occasion, to receive his pills one at a time. In *Estate of Moreland v. Dieter*, an inmate's observation of three incidents of improper pepper-spraying was not sufficient to support allegations of a widespread practice. 395 F.3d at 760. Two incidents of placing black inmates in unsafe "gladiator cell blocks" was not enough to survive summary judgment on a widespread practice claim in *Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003). Likewise, Grieveson's evidence of four incidents that he alone experienced "fails to meet the test of a widespread unconstitutional practice by the Jail's staff that is so well settled that it constitutes a custom or usage with the force of law." *Id.* at 595-96. This simply is not enough to foster a genuine issue of material fact that the practice was widespread—from that evidence alone an inference does not arise that the *county itself* approved, acquiesced, or encouraged the disbursement of entire prescriptions at once. *See Jones v. City of Chicago,* 787 F.2d 200, 204 (7th Cir. 1986) ("[T]here must be some knowledge or an awareness—actual or imputed—of the custom and its consequences showing the municipality's approval, acquiescence, or encouragement of the alleged unconstitutional violation.").

## C.  *Section 1983 Individual-Capacity Claims*

Grieveson's claims against the individual jail officers stem from two types of injuries. First, he claims that the jail officers knew his safety was in danger, but failed to protect him from assaults. Second, he claims that the officers knew he had serious medical needs but they disregarded those needs or postponed attention to those

needs. In order to survive summary judgment on these claims against the jail officers in their individual capacities, Grieveson must demonstrate a genuine issue of material fact with respect to the officer's "deliberate indifference" to Grieveson's safety and medical needs. *Palmer*, 327 F.3d at 593.

Demonstrating deliberate indifference towards a prisoner's safety needs requires a showing that the inmate was "incarcerated under conditions posing a 'substantial risk of serious harm,'" *id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)), and a showing that individual prison officials had subjective knowledge of the risk of harm, which they personally disregarded, *id.* As for the medical claims, the inmate must show that he had an "objectively serious medical need," and that the individual officers were "aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's healthy or safety . . . ." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001).

### 1. Deliberate Indifference to Grieveson's Safety Needs

For six of the assaults Grieveson suffered, we can assume without deciding that he satisfied the first prong of the deliberate indifference inquiry—that he was incarcerated in conditions posing a substantial risk of serious harm. The second prong presents a greater challenge to Grieveson because the inquiry is not whether individual officers *should have* known about risks to Grieveson's safety, but rather whether they *did* know of such risks. *Farmer*, 511 U.S. at 842-43. Even though "'the defendants' knowledge of the risk can be inferred,'" *James v. Milwaukee County*, 956 F.2d 696, 700 (7th Cir. 1992) (quoting *Whitley v. Albers*,

475 U.S. 312, 321 (1986)), for six of the seven assaults Grieveson presents no evidence showing that such an inference is appropriate.

Although his attacker on November 30 called him a snitch, Grieveson presented no evidence that any of the named defendants were aware that Grieveson was perceived as a snitch by his fellow inmates. The mere fact that Grieveson thought he was considered a snitch does not allow a factfinder to conclude " 'that a prison official knew of a substantial risk from the very fact that the risk was obvious.' " *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001) (quoting *Farmer*, 511 U.S. at 842). The only person who believes that Grieveson was considered a snitch (according to the evidence) is Grieveson himself. Any risk to Grieveson's safety on account of the "snitch" label was not obvious. *See Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (stating that an inmate's need for surgery was not obvious); *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1042 (7th Cir. 1998) ("[W]e do not believe that the allegations in the complaint about Mr. Hicks' conduct and tattoo message, without more, indicate an obvious, substantial risk of suicide.").

Grieveson also points to the repeated assaults that he suffered at the hands of other inmates as evidence that the jail officers were subjectively aware of the obvious safety threats Grieveson faced. But looking at the facts uncovered in discovery, even we cannot discern the threat(s) Grieveson faced during his detention. Grieveson never informed the jail officers of a specific threat to his life (*i.e.*, that he was at risk because of his "snitch" reputation). *See Butera*, 285 F.3d at 606. Instead, he told jail officials only that he was afraid and that he wanted to be moved. After his first assault, Grieveson told the jail officers that "the problem was taken out of the block

already" and that he wanted to "let the situation pass." After the second assault, Grieveson informed jail officers that he had been assaulted by another inmate and that he wanted to be moved to another cell block. However, he did not tell the officers who assaulted him, why he had been assaulted (allegedly because of his "snitch" label), or whether he continued to feel threatened by the assaulting individuals. The type of information Grieveson shared with the jail officers is comparable to that shared in *Butera v. Cottey*, where the plaintiff told the jail guards that he was "having problems in the block" and "need[ed] to be removed." 285 F.3d at 606-07. Such vague information did not put the jail officers on notice of a specific threat to Grieveson's safety. *See id.*

Grieveson was assaulted the third time by an inmate who "beat [him] senseless for taking too long to use the toilet." It is hard to imagine how the jail officers would have been on notice of this specific threat to Grieveson's safety. As sad as it may be, the toilet attack, in particular, demonstrates that Grieveson was a "victim of the inherent, as it were the baseline, dangerousness of prison life." *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002).

The fourth assault occurred at the hands of a jail officer, according to Grieveson. This officer has not been identified, and there is no suggestion that the alleged assaulting officer is one of the named defendants in this case. " 'A plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions.' " *Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003) (quoting *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir. 1981)). Grieveson does not argue that the named defendants in this case knew that another jail officer was going to slam Grieveson's arm in a door. "[D]eliberate indifference requires that the corrections

officer must have '*actual* knowledge' of the risk." *Guzman*, 495 F.3d at 857-58 (quoting *Washington v. LaPorte County Sheriff's Dep't*, 306 F.3d 515, 517-18 (7th Cir. 2002)).

Grieveson's fifth assault was similar to his third in that an inmate came after him out of personal frustration. Grieveson attests that he was "pommelled [sic] in the face for allegedly snoring due to [his] broken nose." Skipping to the seventh assault, it also happened at the hands of an angry inmate: "I was attacked by inmate Robert White, who was angry over losing a card game." Grieveson's account of these incidents does not suggest that the assailants lashed out at Grieveson because of his alleged reputation as a snitch. Instead, they demonstrate the tragic realities of jail and prison life that detainees are often subject to, absent fault on the part of individual jail guards. "[P]risons are dangerous places. Inmates get there by violent acts, and many prisoners have a propensity to commit more. Guards cannot turn away persons committed by the courts; nor do individual guards have any control over crowding and other systemic circumstances." *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004); *see also United States v. Tokash*, 282 F.3d 962, 970 (7th Cir. 2002) ("[P]risons are inherently dangerous places and are inhabited by violent people . . . .").

There is no doubt that jail officials have a *duty* to protect detainees " 'from violence at the hand of other inmates.' " *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006) (quoting *Washington*, 306 F.3d at 517). But *liability* of a jail officer for failure to protect an inmate only materializes if the officer knew the inmate faced a " 'substantial risk of serious harm' " and " 'disregard[ed] that risk by failing to take reasonable measures to abate it.' " *Id.* (quoting *Farmer*, 511 U.S. at 847). There is no genuine issue of material fact concerning the assaults Grieveson suffered at the

hands of angry, unstable, violent inmates because there is no evidence demonstrating that any of the named officers knew about these threats to Grieveson's safety. *See Guzman*, 495 F.3d at 857-58.

Grieveson's own affidavits and evidentiary materials confirm that Grieveson's main charge against the jail officers is that they should have known what was going on—not that they did know. He asks in an affidavit, "How many trips would it take to the hospital emergency room for a trained Correctional Officer to realize that I was having problems in Cell Block 2-A? I had already taken 4 (four) trips to the emergency room." Elsewhere he attests: "[a]t no time did the Defendants approach me and ask me as to my personal safety and well being."; "Any layperson, let alone someone 'trained' for observation, could readily see my injuries were consistent with being assaulted. Yet the Defendants did not take adequate measures to . . . assure I was not attacked again."; "Never was I approached by a correctional officer for determination of whether or not I needed assistance."; "It is hard to understand how a prisoner standing there with free-flowing blood should not be enough to spark some interest; but it didn't in my case." Grieveson does not say that he told jail officers he was in danger; rather, he claims that the officers should have realized he was in danger.

In the grievances Grieveson filed (two of which the jail does not report having received, but for purposes of summary judgment we will consider as having been received), he fails to identify a tangible threat to his safety or wellbeing. Grieveson wrote that he was "real scared of my life here and the guards are even afraid to come into the block[—]how do you think we feel." He asked

to be moved to another jail or a "safer" block, but did not put the jail officials on notice of specific threats to his safety. Perhaps the jail officers should have done a better job with Grieveson—maybe they could have initiated more conversations with him, asked him to identify his assailants, invited him to come to them more often with his concerns—but proving deliberate indifference "requires more than a showing of negligent or even grossly negligent behavior. . . . [T]he corrections officer must have acted with the equivalent of criminal recklessness." *Borello*, 446 F.3d at 747.

Also problematic for Grieveson is his failure to tie actions of the named defendants to the injuries he allegedly suffered. See *Alejo*, 328 F.3d at 936; *Starzenski v. City of Elkhart*, 87 F.3d 872, 879 (7th Cir. 1996). Throughout his affidavits and briefs, Grieveson refers to "the defendants," claiming that "the defendants" failed to protect him. Vague references to a group of "defendants," without specific allegations tying the individual defendants to the alleged unconstitutional conduct, do not raise a genuine issue of material fact with respect to those defendants. *See Alejo*, 328 F.3d at 936 (finding dismissal of named defendant proper where plaintiff failed to allege defendant's personal involvement in the alleged wrongdoings).

Thus, for six of the seven assaults, Grieveson has not demonstrated a genuine issue of material fact about the jail officers' deliberate indifference. On the other hand, the sixth attack Grieveson suffered does survive summary judgment insofar as it relates to Officer Highbaugh. Grieveson attests that in March 2001, he was assaulted by other inmates when they stole his personal commissary items and his food. Grieveson claims that Officer Highbaugh witnessed the incident and failed to intervene; later Highbaugh allegedly commented to

Grieveson that he needed to "learn how to fight harder or don't come to jail." If Officer Highbaugh did witness an inmate assault, but failed to intervene, his actions would seemingly "constitute a paradigm case of deliberate indifference." *Haley v. Gross*, 86 F.3d 630, 642 (7th Cir. 1996). The evidence presented by Grieveson respecting the sixth assault establishes a genuine issue of material fact on both prongs of the deliberate indifference inquiry. "First, the danger to the inmate must be objectively serious, posing a substantial risk of serious harm." *Id.* at 640. Grieveson allegedly was assaulted by other inmates—an objectively serious danger that posed a substantial risk of serious harm to him—in the presence of Officer Highbaugh. "Second, the prison official must have a sufficiently culpable state of mind—one of 'deliberate indifference' to inmate health or safety." *Id.* (quoting *Farmer*, 511 U.S. at 834). Officer Highbaugh allegedly watched the assault but did not intervene to protect Grieveson—exhibiting quintessential deliberate indifference.

Finally, with respect to Marion County Officers Boomershine and Commiskey, the district court was correct to grant summary judgment in their favor. Grieveson did not demonstrate that they were personally involved in the injuries he suffered. As discussed above, " '[a]n *individual* cannot be held liable in a § 1983 action unless he caused or participated in [the] alleged constitutional deprivation.' " *Starzenski*, 87 F.3d at 879 (quoting *Wolfe-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)).

2. Deliberate Indifference to Grieveson's Medical Needs

Grieveson alleges that he first told Officers Highbaugh, Cornell, and Duncan about his broken nose during the

afternoon of December 1, 2000. He was told that they would "let Medical know" and one officer had Grieveson fill out a "medical call card." On December 2, Grieveson claims that he again told Officer Duncan that he was in pain and that he needed to be seen by a doctor. Officer Duncan had him fill out a second medical call card. Grieveson was taken to the hospital on the morning of December 3. The total lapse of time between Grieveson's assault and when Grieveson ultimately received treatment is debated by the parties; Grieveson claims that the assault took place on November 30, and that it was almost two days after he first complained to a guard that he received treatment. Grieveson filed a grievance about the delayed medical treatment, and the jail's response supports the notion that the treatment was, in fact, delayed: "[I]t is unforunant [sic] that it took that long to send you to [W]ishard . . . ."

In order to survive summary judgment on a claim for deliberate indifference to serious medical needs, Grieveson must show that he had an objectively serious medical need, and that named guards were deliberately indifferent to it. *Norfleet v. Webster*, 439 F.3d 392, 395 (7th Cir. 2006); *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) ("[A] prison official may evidence deliberate indifference by failing to treat or delaying the treatment of a serious medical need. However, for liability to exist the medical need must be objectively serious."). A delay in the provision of medical treatment for painful conditions—even non-life-threatening conditions—can support a deliberate-indifference claim, s*ee Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997), so long as the medical condition is " 'sufficiently serious or painful,' " *id.* (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)).

The defendants argue that Grieveson cannot survive summary judgment because he did not put forth evidence demonstrating an objectively serious medical condition—he did not " 'place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment.' " *Langston*, 100 F.3d at 1240 (quoting *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir. 1995)); *see also Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) ("[A] plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental."). We recently considered what qualifies as "verifying medical evidence" in *Williams v. Liefer*:

> Clearly, expert testimony that the plaintiff suffered because of a delay in treatment would satisfy the requirement. On the other hand, evidence of a plaintiff's diagnosis and treatment, standing alone, is insufficient *if it does not assist the jury in determining whether a delay exacerbated the plaintiff's condition or otherwise harmed him*.

*Id.* at 715 (emphasis added). As in *Williams*, "the evidence in this case falls somewhere in between a bare recitation of treatment received and expert testimony about the delay's effect." *Id.* Grieveson did not introduce expert testimony stating that his medical condition worsened because of the delay—but that does not mean Grieveson offered no verifying medical evidence. *See id.* Grieveson supplied medical records indicating that he had a nasal fracture, that he could experience further bleeding, and that he may need to see a specialist. Grieveson later underwent painful nose surgery. The evidence Grieveson provided would certainly help a jury determine whether the delay "unnecessarily prolonged and exacerbated" Grieveson's pain, *id.*, and thus qualifies as verifying

medical evidence that supports a genuine issue of material fact regarding the seriousness of Grieveson's medical condition.

Based on the evidence provided by Grieveson, a jury could further infer that the delays of Officers Highbaugh, Cornell, and Duncan in arranging medical treatment caused Grieveson "that many more hours of needless suffering for no reason." *Id.* According to Grieveson, these three guards knew that he was in pain, but they did not secure medical treatment for him until, at the earliest, one-and-a-half days after they knew about the injury. Grieveson's affidavits create a genuine issue of fact as to the officers' states of mind. "Although a negligent or inadvertent failure to provide adequate medical care is insufficient to state a deliberate indifference claim, it is enough to show that a defendant actually knew of a substantial risk of harm to the inmate and acted or failed to act in disregard to that risk." *Gil v. Reed*, 381 F.3d 649, 661 (7th Cir. 2004); *see also Williams*, 491 F.3d at 716 ("[A] jury could find that the defendants' delay caused [the inmate] six extra hours of pain and dangerously elevated blood pressure for no good reason.").

Grieveson's claim for deliberate indifference to his medical needs survives summary judgment as against Officers Highbaugh, Cornell, and Duncan to the extent that the claim relates to delays in treatment after Grieveson's first assault. Grieveson does not proffer sufficient evidence to survive summary judgment for any other delays in medical treatment because he does not show that the named defendants were personally involved in the other delays. *See Alejo,* 328 F.3d at 936.

### D.  State-Law Negligence Claim

The district court briefly addressed Grieveson's negligence claim. It outlined the cause of action: a plaintiff must demonstrate that (1) the defendant had a duty, arising from his relationship with the plaintiff, to exercise the relevant standard of care; (2) the defendant failed to conform his conduct to that standard of care; and (3) the defendant's failure to meet that standard of care proximately caused the plaintiff's injury. *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991). The court found that the defendants had a duty of care with respect to the jail's inmates, including Grieveson. The court then decided that "there was no negligence on the part of the defendants toward the plaintiff's welfare because Grieveson was not injured as a proximate result of any defendant's breach of a duty owed to Grieveson."

Grieveson's burden on a negligence claim is far less than his burden on a § 1983 deliberate-indifference claim. *See Perkins*, 312 F.3d at 876. Whereas Grieveson had to show that the named jail officers knew about a substantial risk to Grieveson's health and safety to sustain a § 1983 claim, *see Guzman*, 495 F.3d at 857-58, negligence law exists to deal with the very types of allegations Grieveson made here—that certain individuals *should* have acted differently in light of the duties applicable to them, and that their failure to abide by the relevant standard of care caused Grieveson personal injury. Many of Grieveson's allegations suggest that jail officers should have done things differently: they should have maintained a more sanitary facility; they should have realized Grieveson's safety was at risk and actively tried to determine and eliminate the source of that risk; they should have taken him to the hospital promptly after learning

that he was assaulted and thought he had a broken nose; they should have ensured that he received the surgery he needed on his eye within the required time period— and they should have informed his next detention center that immediate surgery was imperative and provided his new placement with his medical records.

Grieveson established through his pleadings, discovery and disclosure materials, and affidavits that there is a genuine issue of material fact surrounding his state-law negligence claim. *See* Fed. R. Civ. P. 56(C).

### III. CONCLUSION

For the foregoing reasons, we AFFIRM in part and RE-VERSE in part the judgment of the district court, and REMAND for further proceedings.