In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2204

LISA KING, as Special Administrator
for the Estate of John P. King,

*Plaintiff-Appellant,*

*v.*

SUE KRAMER, KAREN MONDRY-ANDERSON,
WILLIAM J. OLSON, JENNIFER KOBY-GOBEL and
LA CROSSE COUNTY, WISCONSIN,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:10-cv-00123—**William M. Conley**, *Chief Judge.*

ARGUED OCTOBER 17, 2011—DECIDED MAY 25, 2012

Before BAUER, POSNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* John P. King died while incarcer-
ated at the infirmary in the jail operated by La Crosse
County, Wisconsin. King's widow, Lisa King, brought an
action under 42 U.S.C. § 1983 against five defendants:
Officer William Olson, Officer Jennifer Koby-Gobel,

Nurse Sue Kramer, Nurse Karen Mondry-Anderson, and La Crosse County. For the reasons discussed below, we affirm in part and reverse in part the district court's grant of the defendants' motion for summary judgment.

**I**

Our account of the facts proceeds, as it must, in the light most favorable to King; as usual, we are not vouching for anything. *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011). On April 7, 2007, King was booked at the La Crosse County Jail to await trial. The County contracts with a private company, Health Professionals Ltd. (HPL), to provide medical care for the inmates. The 2007 contract makes HPL responsible for providing a physician to attend weekly sick call "for an estimated minimum of one hour and an estimated maximum of three hours except as is medically necessary." Dr. Erickson was the physician under contract with HPL to conduct on-site visits for at least two and no more than four hours a week; he typically came on Tuesdays. No other physician was physically present at the jail during the week. The contract also gave HPL the authority to develop a preferred drug list, the so-called formulary.

King suffered from serious medical problems, including severe anxiety, at the time of his incarceration. His doctor at the Tomah Veterans Hospital had prescribed for him a daily regimen of medications that included five milligrams of alprazolam, a benzodiazepine. King brought with him to the jail two grocery bags full of his

medications, including a bottle with 115 one-milligram tablets of alprazolam. Nurse Karen Mondry-Anderson conducted his initial health screening. King told her that he had asthma, diabetes, a heart problem, high blood pressure, seizures, and mental health problems. He also said that he had mental health issues that would require attention while he was at the jail.

Mondry-Anderson contacted the on-call physician, Dr. Stephen Cullinan, who was based nearly 300 miles away in Peoria, Illinois. She informed him that King had a large bottle of alprazolam in his possession, but that she was not certain of his prescribed daily dosage. Obviously unable to examine King, and not bothering to obtain the details about the VA prescription, Dr. Cullinan nevertheless scheduled him to be weaned off the alprazolam, a drug excluded from HPL's formulary, over a three-day period. This was a dangerously rapid reduction given King's existing prescription. Dr. Cullinan ordered King to be switched to a beta blocker, Inderal, that was on HPL's formulary, rather than another benzodiazepine. Beta blockers may be used off-label to treat performance anxiety. They are often helpful to performers and public speakers because they block the physical symptoms of anxiety, notably tremors and shortness of breath. Dr. Brian Brennan, *What Are Beta Blockers, How Do They Work, and How Are Beta Blockers Used in the Treatment of Anxiety Disorders*? ABC NEWS, http://abcnews.go.com/Health/AnxietyTreating/ story?id=4664801 (last visited May 22, 2012). They do little to reduce the feeling of anxiety, and are not recommended for patients with heart conditions or

asthma. Lundbeck Institute, Anxiety Disorders, http://www.brainexplorer.org/anxiety/Anxiety_Treatment.shtml (last visited May 22, 2012). Given that King was not seeking short-term performance anxiety relief and that he did suffer from a heart problem and asthma, it is not clear why Inderal was chosen for him. The jail medical staff failed to give King any alprazolam on his first day. On the second and third days, he received two doses, and he received one final dose on the fourth day, April 10.

Abrupt withdrawal from alprazolam can be life-threatening. Associated symptoms include agitation, elevated blood pressure, elevated pulse, tremors, delusions, hallucinations, and seizures. The severity of such symptoms requires medical providers to monitor the patient closely, preferably in a hospital. No member of the jail's medical staff prepared a plan to monitor King's withdrawal.

King was housed in Receiving Cell C with four other inmates: Michael Kleiber, John Gerke, Jesse Reid, and Clinton Stevens. King's health appeared to deteriorate in the days following his arrival at the jail. His shaking became more severe, and he became less and less coherent. King told Kleiber that he had been given a replacement medication that made him feel shaky and caused him to hallucinate.

On April 10, Nurse Deb Baker faxed a medical release to Tomah Veterans Hospital for a complete list of King's prescriptions. The Hospital provided the jail

with the requested information later that day. The documentation stated that King was prescribed five milligrams of alprazolam daily. The list of medications was placed in King's medical file, where it remained available for the physician at his weekly on-site visit.

King submitted a health request the following day indicating that he wanted to be seen by a physician. He stated that he had not slept in at least 96 hours, among other concerns. He complained to jail staff that he was suffering from side effects of the medication, but they informed him that he needed to wait for the doctor. Again on April 13, King requested health care and was informed that he would meet with a physician at the next available appointment. He was seen by a social worker on April 13, who noted that King appeared anxious and was perspiring. King was not finally seen by a physician until April 17, ten days after he was admitted to the jail. The physician, Dr. Erickson, noted that King had pressured speech and flights of ideas with manic insomnia.

The critical events forming the basis of this action took place on April 18. In the morning, Officers Brian Olson and Jennifer Koby-Gobel conducted a cell check and saw King lying in his bed. He made eye contact with Olson and then closed his eyes and twitched his arm. At approximately 10:30 a.m., Gerke, one of King's cellmates, called for help. Olson and Koby-Gobel found King convulsing on the floor, screaming and foaming at the mouth. They called for a nurse.

Nurse Sue Kramer, the site director, was with three nursing students at the time and responded to the call.

On their way to King's cell, Kramer told the nursing students that inmates fake seizures. When Kramer arrived, she tried to put a pulse oximeter on King's toe, but his shaking was too intense to keep it on. Olson told King to "quit acting like a child and get up" and accused him of faking the seizure. Kramer was unable to get a blood pressure reading because King was shaking too hard. She then used smelling salts to look for a reaction, but there was none. Failure to respond to smelling salts is consistent with seizures. King's face turned blue. Kramer and the officers, convinced that King was faking, left King lying on the floor. They did not contact the on-call physician, Dr. Cullinan, or emergency medical services.

An hour later, Stevens, another cellmate, called out for help because King was again convulsing. Kramer and the officers returned. Kramer again chose not to contact Dr. Cullinan or emergency medical services. Kramer was aware that King was being tapered off alprazolam and understood that alprazolam withdrawal can cause seizures, hallucination, and death. Interestingly, she ordered that the officers move him to a padded cell.

After King was moved, Kramer did nothing else. She did not have the authority to open the door of the padded cell. She testified that she wanted to take his vitals, but the officers were too busy to let her in. The nursing staff was able to observe King only on a small screen in the nurse's station, but the quality of the image was very poor. There was an intercom system in the cell, but it was very difficult to hear with the echo.

Kramer was relieved by Mondry-Anderson at around 5:00 p.m. Kramer informed her that King had faked a seizure earlier in the day. She said that King had responded to smelling salts by turning away from them. Mondry-Anderson was not particularly concerned about King's condition, given Kramer's misleading account of the day's events.

At around 5:30 that afternoon, King called the jailers on the intercom. Jailer Annie Corcoran was unable to understand him because of the echo in the cell. She spoke with him directly through the food slot 15 minutes later. He told her that it was fine for her to look around his cell. He then said that his cell door was locked, he could not get out, and that he was hearing voices. When Corcoran asked him what the voices said, he did not answer. He asked if he could use the toilet, and Corcoran instructed him to use the grate in the back of the cell.

At 6:00 p.m. Mondry-Anderson checked on King using the television monitor in the nurse's station. She could not see the image well, but she noted that King appeared to be lying on the floor and then was able to walk around seemingly without any difficulty. One of the jailers notified her that King had eaten about half of his dinner.

At 7:30 p.m., Mondry-Anderson went to give King his medication, but he was unresponsive when she called out to him. She called for officers to open his cell and attempted resuscitative efforts. King was pronounced dead at 7:58 p.m. Alprazolam withdrawal probably caused

King's seizures and was a contributing factor to King's death.

## II

Pre-trial detainees, who are not yet being punished for anything, are protected from cruel and unusual punishment through the Fourteenth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976); *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). Detainees are entitled to no less protection than prisoners whose treatment must meet the standards of the Eighth Amendment. *Minix*, 597 F.3d at 831. For convenience, we therefore refer to cases brought under either theory.

To defeat summary judgment on the individual claims, King must satisfy both an objective and a subjective element. *Estelle*, 429 U.S. at 105; *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). He must first present evidence supporting the conclusion that he had an "objectively serious medical need." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001). An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Zentmyer v. Kendall Cnty.*, 220 F.3d 805, 810 (7th Cir. 2000) (citations omitted). He must also demonstrate a genuine issue of fact on the question whether the nurses and officers were aware of this serious medical need and were deliberately indif-

ferent to it. *Wynn*, 251 F.3d at 593. Negligence—even gross negligence—is insufficient to meet this standard, but the plaintiff is not required to show intentional harm. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The standard is comparable to that required for criminal recklessness. *Id.* at 839.

King has met his burden of presenting evidence adequate to support a finding that he had a serious medical condition. King's medical expert stated that he suffered from severe seizures that contributed to his death. Medical conditions much less serious than seizures have satisfied the standard. *Elyea*, 631 F.3d at 861 (noting that "our cases demonstrate a broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit"). We can thus pass quickly to the question whether he has presented enough evidence of deliberate indifference to survive summary judgment. The answer, as we explain, varies from defendant to defendant.

## III

### A

Turning first to King's claims against Officers Olson and Koby-Gobel, we find that the district court correctly granted summary judgment in their favor. The officers were not responsible for administering medical care

to King; rather, they were "entitled to defer to the judg-ment of jail health professionals so long as [they] did not ignore [the prisoner]." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). Olson and Koby-Gobel immediately notified the nursing staff when King's seizures began at 10:30 a.m. and resumed at 11:30 a.m. They monitored King while waiting for Kramer to arrive.

The only exception to this rule is that nonmedical officers may be found deliberately indifferent if "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) (citations omitted). King does not present any evidence that Olson and Koby-Gobel were aware that Kramer was improperly treating King. They were not trained to assess whether an inmate is genuinely experiencing seizures, and so they lacked the capacity to judge whether Kramer made an inappro-priate diagnosis.

B

The standard for deliberate indifference is different for the medical staff. A medical professional's deliberate indifference may be inferred when "the medical profes-sional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996).

Nevertheless, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. In evaluating the evidence, we must remain sensitive to the line between malpractice and treatment that is so far out of bounds that it was blatantly inappropriate or not even based on medical judgment. Although this is a high standard, King is not required to show that he was "literally ignored." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

There is a question of material fact whether Kramer's actions were so far afield from an appropriate medical response to King's seizures that they fell outside the bounds of her professional judgment. Kramer's statements to the nursing students suggests that she had already decided that King was faking seizures even before she saw him. She was aware that he was withdrawing from alprazolam, and that seizures can result from withdrawal. Upon arriving at the cell, she was unable to get reliable oximeter and blood pressure readings because King's convulsions were too severe. When she then employed the smelling salts test, his response was consistent with a seizure. His face turned blue, which we note is one of the symptoms that requires immediate medical attention, according to the MedlinePlus service of the U.S. National Library of Medicine at the National Institutes of Health. See http://www.nlm.nih.gov/medlineplus/ency/article/00306 9.htm (last visited May 22, 2012). Kramer deliberately ignored the results of the tests she was able to administer. This evidence is enough to raise a question of material

fact whether Kramer was subjectively aware that King faced a serious risk of a medical emergency. *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998).

If Kramer had chosen to leave King lying on the cell floor after she tried to check on him, perhaps we could have found that her actions amounted to nothing more than gross medical negligence. But Kramer took matters further when she chose to remove King from his cell—where his cellmates could call for help if he experienced another seizure—to a padded cell where the intercom system was difficult to hear, the camera image quality was too poor to clearly identify his movements, and the nurses did not have direct access to him. (And why put him in a padded cell if this was all an act? A jury might see this as evidence that she was aware of a high risk that the seizures were genuine.) This is not a case where reasonable medical minds may differ over the appropriate treatment for King. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). It is, rather, analogous to the hypothetical nurse who knows that an inmate faces a serious risk of appendicitis, but nevertheless gives him nothing but an aspirin. *Sherrod v. Lingle*, 223 F.3d 605, 611-12 (7th Cir. 2000). Unlike an inmate suffering from a tooth abscess or broken arm, King was not suffering from a condition that allowed him to call for help. He depended on others to notice his severe hallucinations or seizures and to request emergency care on his behalf.

As for Mondry-Anderson, we agree with the district court that she was not deliberately indifferent to

King's serious medical condition. She did not directly observe his seizures, but instead relied on Kramer's characterization of the morning's events when she arrived for work that evening. Kramer informed Mondry-Anderson that King responded to the smelling salts, walked normally, and had normal oxygen levels. Mondry-Anderson had no reason to disbelieve Kramer. She thus lacked the requisite subjective knowledge that King suffered from a serious medical condition or faced a serious medical risk.

## C

The final question is whether King has presented enough evidence to survive summary judgment with respect to his claim against La Crosse County. The County cannot be held liable for the unconstitutional acts of its employees unless those acts were part of an official custom or policy. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); see *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008). It is not enough to assert that the municipality is responsible under a theory of *respondent superior*. *Monell*, 436 U.S. at 691. To survive summary judgment, therefore, King "must present evidence demonstrating the existence of an official policy, widespread custom, or deliberate act of a county decision-maker of the municipality or department." *Grieveson*, 538 F.3d at 771 (internal citations omitted). King must also show that the official policy or custom caused his constitutional violation. *Id*.

The Supreme Court has confirmed that the infliction of unnecessary suffering through the failure to provide adequate medical care for inmates is covered by the Eighth Amendment (and thus, in our setting, by the Fourteenth). *Estelle*, 429 U.S. at 104-05. The County cannot shield itself from § 1983 liability by contracting out its duty to provide medical services. (Indeed, the Court's recent decision in *Filarsky v. Delia,* 132 S. Ct. 1657 (2012), to the effect that private contractors are entitled to assert qualified immunity, suggests by parity of reasoning that they are state actors for other purposes as well.) The underlying rationale is not based on *respondent superior*, but rather on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it. *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705-06 (11th Cir. 1985).

The evidence presented for summary judgment purposes shows that the County's policy was to entrust final decision-making authority to HPL over inmates' access to physicians and medications. Nothing in the record as of now suggests that the County had higher aspirations for the care it was providing, but that those standards were not met. The contract the County had with HPL at the time of King's incarceration states that HPL was responsible for providing a physician to attend weekly sick call "for an estimated minimum of one hour and an estimated maximum of three hours except as is medically necessary." The contract also states that "HPL shall provide monitoring

of pharmacy usage as well as development of a preferred drug list."

HPL's practice at the time of King's incarceration was to have Dr. Erickson at the jail for visits with patients for no more than four hours a week. The on-call physician, Dr. Cullinan (who was in Peoria and thus not able to back up Dr. Erickson for personal visits), was not expected to prescribe medications in person. HPL trained its nurses to follow a protocol when inmates arrived with medications excluded from HPL's formulary: Ask the inmate how long he has been on the medication and then notify Dr. Cullinan so that he would be in a position to write orders over the phone to transfer the inmate to a permitted drug.

We are not saying here that prescription formularies are *per se* unconstitutional, or that restricted physician access is by definition inappropriate. It is instead the County's endorsement of the particulars of the arrangements in this case and the way the two policies interacted, that caused it to run afoul of the Constitution (if we believe King's account). The County's express policies as embodied in the contract show that the County delegated to HPL final authority to make decisions about inmates' medical care. We have previously said that a municipality would violate the Eighth Amendment under *Monell* if it had a policy requiring jail staff to throw away all prescription medications without implementing an appropriate mechanism for providing alternative treatment. *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005). This case eerily

tracks that hypothetical example: HPL routinely switched patients off prescribed medications without appropriate oversight by a physician.

Even if the County had not delegated final decision-making authority to HPL, it was on notice that HPL's physician- and medication-related policies were causing problems at the jail. If the County is "faced with actual or constructive knowledge that its agents will probably violate constitutional rights, [it] may not adopt a policy of inaction." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). There were at least seven articles published by the La Crosse Tribune expressing alarm over HPL's medication policy. Steve Helgeson, who became the Sheriff on January 1, 2007, testified that he was aware of the discussions involving the jail's problems with medication distribution to inmates in 2004 and 2005. This is enough evidence to create a question of material fact whether the County was aware at the relevant time that HPL had policies that violated inmates' constitutional rights.

In summary, King has pointed to significant evidence that the County's policies violated his constitutional rights. Mondry-Anderson was concerned about taking King off alprazolam at booking, but she was required to abide by HPL's policy of switching him to the formulary. King was prescribed dramatic changes in his medication by an "on-call" physician nearly 300 miles away who took no steps to educate himself about King's condition. These policies caused King to suffer severe seizures

that ultimately contributed to his death. We therefore hold that King has presented sufficient evidence to survive summary judgment with respect to the County.

**IV**

We AFFIRM the district court's grant of summary judgment in favor of Olson, Koby-Gobel, and Mondry-Anderson, but we REVERSE with respect to King's claims against Kramer and the County. All parties are to bear their own costs on appeal.