In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1419

ALMA GLISSON, as Personal Represen-
tative of the Estate of NICHOLAS L.
GLISSON,

*Plaintiff-Appellant*,

*v.*

INDIANA DEPARTMENT OF CORREC-
TIONS, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:12-cv-01418-SEB-MJD — **Sarah Evans Barker**, *Judge.*

ARGUED OCTOBER 26, 2015 — DECIDED FEBRUARY 17, 2016

Before WOOD, *Chief Judge,* and BAUER and SYKES, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiff-appellant, Alma Glisson ("Appellant"), sued Correctional Medical Services, Inc., also known as Corizon, Inc. ("CMS"), its employees Dr. Malaka G. Hermina ("Dr. Hermina"), Mary Combs, R.N. ("Nurse Combs"), and the Indiana Department of Corrections ("IDOC") (collectively "Appellees"), on behalf of her deceased son,

Nicholas Glisson ("Glisson"). Glisson died while incarcerated at Plainfield Correctional Facility ("Plainfield") in Plainfield, Indiana. The lawsuit's federal claims arise under 42 U.S.C. § 1983 ("§ 1983"), specifically alleging that Appellees did not offer Glisson constitutionally adequate medical care, and that this failure violated his Eighth Amendment rights against cruel and unusual punishment. The district court granted summary judgment in favor of Appellees on all federal claims, and remanded the remaining state law claims. Appellant now only appeals the grant of summary judgment in favor of CMS, arguing that CMS's failure to implement a particular IDOC Health Care Service Directive (the "Directive") violated Glisson's Eighth Amendment rights. However, because Appellant has not produced legally sufficient evidence to demonstrate a genuine issue of material fact on this matter, we affirm summary judgment for CMS.

## I. BACKGROUND

Glisson's medical history is tragic. Diagnosed with laryngeal cancer in 2003, he underwent surgery that removed his larynx and part of his pharynx. The surgery also removed portions of Glisson's mandible and thirteen teeth. The surgery left him with a permanent stoma, or opening in his throat, accompanied by a tracheostomy tube. He was later fitted with a voice prosthesis, and received postoperative radiation treatment. After the surgery, he suffered from painful swallowing (dysphagia) and neck pain, both resulting from progressive neck instability. In 2008, doctors inserted a gastrojejunostomy tube ("G-tube") through his stomach to help with nutrition. In March 2010, a cancerous lesion was found on his tongue, but was successfully excised.

Exacerbating the effects of Glisson's cancer and surgery were ongoing memory issues, hypothyroidism, depression, smoking, and alcohol abuse. Despite these many health issues, Glisson lived independently and cared for himself; he even cared for his grandmother when she was sick and his brother when he was dying.

On August 31, 2010, Glisson was sentenced to incarceration for dealing in a controlled substance. He came into the custody of IDOC on September 3, 2010. IDOC housed him in its Reception Diagnostic Center from September 3 through September 17. During this time, CMS medical personnel noted spikes in Glisson's blood pressure, an occasional low pulse, and low oxygen saturation level. He also demonstrated signs of confusion and anger, and was at one point deemed a suicide risk. As a result, IDOC placed him in segregation and had him undergo a psychiatric evaluation.

IDOC transferred him from the Reception Diagnostic Center to Plainfield on September 17. At Plainfield, Glisson's condition further deteriorated. At Plainfield, he came under the medical care of Dr. Hermina and Nurse Combs. Plainfield personnel quickly determined that Glisson's medical issues were worsening. On September 29, he presented with symptoms suggesting acute renal failure. In response, IDOC personnel transferred him to a local hospital, where he remained until October 7.

Upon returning to Plainfield, Glisson appeared stable. However, on the morning of October 10, Nurse Combs witnessed Glisson exhibiting strange behavior and transferred him to a medical isolation room. While isolated, Glisson was restless, moving from one side of the bed to the other. At 8:20 a.m., IDOC staff reported that Glisson was sitting upright

in his bed, unresponsive. Emergency personnel arrived at 8:30 a.m., and pronounced Glisson dead at 8:35 a.m. The coroner concluded that Glisson died of natural causes, resulting from complications of laryngeal cancer with contributory renal failure. A pathologist agreed with these findings, and added that Glisson's various medical issues—diminished mental state, oxygen deficiency, and acute renal failure—were directly attributable to his throat cancer and laryngectomy.

After Glisson's death, Appellant sued Appellees in Indiana state court. She alleged that Dr. Hermina and Nurse Combs were deliberately indifferent to Glisson's medical needs. She also alleged, under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and its progeny, that CMS's failure to implement the Directive led to this deliberate indifference. The Directive reads:

> Each facility must develop a site[-]specific directive that guides the management of the chronic disease management and clinics. Each site must have easily available a compilation of instructions for proper management [of] chronic diseases in the chronic disease clinic setting.

Related IDOC guidelines further note that the Directive is necessary because "[o]ffenders with serious chronic health conditions need to receive planned care in a continuous fashion" and that care provided to such inmates "should be organized and planned and should be consistent across [IDOC] facility lines."

CMS has argued throughout the litigation that it is not obligated to implement IDOC directives. It also admitted that it did not implement the Directive, stating instead that Glisson's care was "based on standards of medical and nursing

care." CMS acknowledged that while IDOC "implement[s] Health Care Service Directives … generally none of those directives were relied on in rendering medical care and treatment to Mr. Glisson."

Appellant claims that because CMS did not adopt the Directive and did not create a centralized treatment plan for Glisson, his care was fractured and disorganized. She argues that CMS's *lack* of a policy of centralized care for inmates like Glisson led to the deliberate indifference of Dr. Hermina, Nurse Combs, and other CMS personnel. She specifically argues that CMS's failure to adopt any policy mandating coordinated care "prevent[ed] [CMS] medical personnel from communicating properly and ensuring appropriate continuity of care for inmates with serious medical problems," such as Glisson.

After Appellant filed the suit in Indiana court, Appellees removed the case to federal court, and then moved for summary judgment on the federal law claims. The district court granted summary judgment for Appellees, and remanded the remaining state law claims. In granting summary judgment, the district court found that Dr. Hermina's and Nurse Combs's actions did not constitute deliberate indifference, and that as a result Glisson did not suffer any constitutional injury. Having determined that Glisson suffered no constitutional injury, the district court then held that Appellant could not prove a *Monell* claim against CMS as a matter of law.

Appellant appealed the district court's order.

## II. DISCUSSION

Appellant only appeals the dismissal of her *Monell* claim against CMS. But this claim fails for want of necessary evidence. Specifically, Appellant has not presented evidence that

CMS's failure to implement the Directive led to a widespread practice of deliberate indifference against not only Glisson, but other inmates as well.

We review the grant of summary judgment *de novo*, construing the facts in the light most favorable to the non-moving party—here, Appellant. *Rahn v. Bd. of Trustees of N. Ill. Univ.*, 803 F.3d 285, 287 (7th Cir. 2015) (citation omitted). Summary judgment is appropriate when there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Lalowski v. City of Des Plaines*, 789 F.3d 784, 787 (7th Cir. 2015). That is, at this stage, Appellant must have produced evidence that indicates a genuine issue of material fact. *See Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (quotations and citations omitted). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e) in holding that non-moving party must "designate 'specific facts showing that there is a genuine issue for trial'").

Here, Appellant must produce evidence that CMS's failure to adopt the Directive led to deliberately indifferent medical care by CMS personnel. Government entities[1] "have an affirmative duty to provide medical care to their inmates." *Duckworth v. Ahmad*, 532 F.3d 675, 678–79 (7th Cir. 2008) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Deliberate indifference to a prisoner's "serious medical needs … constitutes the 'unnecessary and wanton infliction of pain' and violates the Eighth Amendment's prohibition against cruel and unusual

---

[1] Though a private corporation, CMS concedes that because it performs a government function—providing medical care to state prisoners—it may be liable as a government entity under § 1983. *E.g., Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982).

punishments." *Duckworth*, 532 F.3d at 679 (quoting *Estelle*, 429 U.S. at 104 (internal quotation and citation omitted)).

Here, Appellant has not produced the necessary evidence for a *Monell* claim against CMS. Private corporations like CMS cannot be liable in a § 1983 suit under *respondeat superior*.[2] *E.g., Iskander*, 690 F.2d at 128; *Gayton v. McCoy*, 593 F.3d 610, 622 (7th Cir. 2010); *Maniscalco v. Simon*, 712 F.3d 1139, 1145 (7th Cir. 2013). Thus, even if Dr. Hermina and Nurse Combs were deliberately indifferent to Glisson's medical needs, a court cannot impute this liability to their employer, CMS. Rather, to survive summary judgment, Appellant must produce evidence of "the existence of an 'official policy' or other governmental custom that not only causes but is the 'moving force' behind the deprivation of constitutional rights." *Teesdale v. City of Chi.*, 690 F.3d 829, 833–34 (7th Cir. 2012) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989)). *See also Monell*, 436 U.S. at 694.

Further, where a plaintiff alleges that a *lack* of a policy caused a constitutional violation, she must produce "more evidence than a single incident to establish liability." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 822–23 (1985)). She must produce

---

[2] Additionally, though CMS did not argue waiver on appeal, Appellant has nevertheless waived her right to recovery on a theory of *respondeat superior*. In the district court, she stated in her response to Defendants' Motion for Summary Judgment, "Plaintiff does not seek to impose liability on CMS under § 1983 based on *respondeat superior*." Yet Appellant now asks this Court to apply *respondeat superior* to private corporations like CMS. This is a new argument on appeal, and is thus waived. *See Brown v. Automotive Components Holdings, LLC*, 622 F.3d 685, 691 (7th Cir. 2010) ("[a]rguments not raised in the district court are considered waived on appeal").

evidence of a "series of incidents" (*Hahn v. Walsh*, 762 F.3d 617, 638 (7th Cir. 2013), *cert. denied*, 135 S. Ct. 1419 (2015)), or a "widespread practice constituting custom and usage." *Phelan v. Cook Cnty*., 463 F.3d 773, 789 (7th Cir. 2008) (a "widespread practice" argument "would focus on the application of the policy to many different individuals"). Evidence of a series of incidents permits the inference that "there is a true municipal policy at issue," and allows the factfinder "to understand what the omission means." *Calhoun*, 408 F.3d at 380. By presenting a series of incidents where "the same problem has arisen many times and the [government entity] has acquiesced in the outcome," a plaintiff has produced sufficient evidence that the lack of policy is in fact a *de facto* policy choice, not a discrete omission. *Id.* However, "[w]ithout evidence that a series of incidents brought the risk at issue to the attention of the policymaker, we cannot infer that the lack of a policy is the result of deliberate indifference." *Hahn*, 762 F.3d at 637–38 (citing *Calhoun*, 408 F.3d at 380).

Such is the case here. Appellant alleges that CMS failed to implement the Directive mandating a centralized care plan for inmates such as Glisson. Appellant therefore argues that CMS's lack of a policy was the "moving force" behind any deliberate indifference to Glisson's medical needs. Thus, to show that CMS's failure to implement the Directive amounted to a *de facto* policy, Appellant must have produced evidence that CMS staff had been deliberately indifferent to other inmates, and that a widespread practice of deliberate indifference flowed from the failure to implement the Directive. But Appellant has not done so. Instead, she has only produced evidence of alleged deliberate indifference towards Glisson,

and admitted as much at oral argument.[3] This evidence alone is insufficient to maintain a *Monell* claim against CMS. Absent evidence of a series of incidents or a widespread practice against other inmates, we cannot infer that CMS's failure to implement the Directive was the result of deliberate indifference. *See Hahn*, 762 F.3d at 637. Therefore, Appellant's claim fails as a matter of law, and summary judgment for CMS was appropriate.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[3] Appellant waived use of evidence of other incidents because she did not present such evidence before the district court. Her "Separate Appendix" includes a 2013 *Miami Herald* news article discussing various lawsuits brought by Florida prisoners against CMS (as Corizon), a 2012 expert report relating to a lawsuit against Corizon brought in federal court in Idaho, and a 2015 settlement order related to a lawsuit against Corizon in the Northern District of California. She argues in her appellate brief that this is evidence of a "pattern of constitutionally inadequate care." But she presented none of these three documents as evidence before the district court. Of course, she could not have presented the 2015 settlement order to the district court in this case, because the district court in this case ruled on summary judgment on June 4, 2014. However, the district court presiding over the Northern District of California settlement had denied summary judgment to Corizon on April 14, 2014, before the district court in this case ruled. *See M.H. v. Cnty. of Alameda*, 62 F. Supp. 3d 1049, 1087–88 (N.D. Cal. 2014). Thus, Appellant could have offered the denial of summary judgment in *M.H.* as supplemental authority for her argument before the district court. But she failed to do so, and has thus waived any argument relating to these three documents. *See Brown*, 622 F.3d at 691.

WOOD, *Chief Judge*, dissenting. Most cases in which a prisoner raises a claim about constitutionally inadequate medical care in the prison are brought against the doctor or other professional who actually delivered the services. In those cases, as *Estelle v. Gamble*, 429 U.S. 97 (1976), and *Farmer v. Brennan*, 511 U.S. 825 (1994), illustrate, the prisoner may prevail only if the providers exhibited deliberate indifference to a substantial risk of serious harm. The Eighth Amendment, after all, is about unconstitutional punishment, not about medical competence. But there is another theory that has been cognizable under 42 U.S.C. § 1983 ever since the Supreme Court decided *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Overruling *Monroe v. Pape*, 365 U.S. 167 (1961), insofar as that case held that municipalities are immune from suit under section 1983, *Monell* drew a line between *respondeat superior* liability and direct liability for the municipal organization's own policies. It rejected the former, but it held that the latter was actionable. That latter theory is the one under which plaintiff Alma Glisson, acting as the personal representative of her deceased son, Nicholas L. Glisson, is seeking to recover damages against Correctional Medical Services, Inc. (Corizon), the company that was responsible for the deplorable medical care Glisson received in Indiana's Plainfield Correctional Facility. (Unless the context requires otherwise, my references to "Glisson" mean Nicholas, not Alma.)

In *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010), this circuit confirmed that private corporations that contract with jails or prisons to provide medical services are treated the same as municipalities for purposes of liability under section 1983. That rule applies to defendant Corizon. Alma Glisson asserts that Corizon maintained a policy that led directly to

her son's death. My colleagues have concluded that she cannot prevail—indeed, that the paper record is so one-sided that it was proper for the district court to grant summary judgment in Corizon's favor. That conclusion can stand only if they have correctly depicted what it takes to prove that Corizon's policies violated the Eighth Amendment. They characterize this case as a complaint about the *lack* of a policy, and they assert that the plaintiff must therefore show a series of incidents or a widespread practice. Alma Glisson did not submit such evidence (at least not in a timely fashion), and so, they conclude, she fails. This syllogism assumes that policies are always affirmatively stated and that a decision *not* to regulate cannot also be a policy. Nothing in *Monell* or later cases, however, so holds. The relevant questions in all instances are (a) what is the policy at issue, and (b) whether that policy reflects deliberate indifference to a serious medical need. Taking the facts in the light most favorable to the plaintiff, a rational jury could find that Corizon deliberately structured the delivery of medical care in a way that lacked critical oversight. That policy in Glisson's case predictably had fatal results. I would reverse and send this case to trial.

## I

Before turning to the legal analysis, it is helpful to review the facts in some detail. Although Glisson had suffered from bad health for many years, he was able to function on his own until he was taken into custody by the Indiana Department of Corrections (INDOC) on September 3, 2010 (following his conviction for giving one prescription painkiller pill to a friend).

Indeed, he not only lived independently, but he also provided care to his grandmother and his dying brother. After 41 days in custody, 37 of which were in INDOC's care, prison staff found him dead in his cell. The coroner concluded that Glisson died of "complications of laryngeal cancer." But that was not all he said. He also noted Glisson's "malnutrition," "extreme emaciation and cachexia [wasting away of tissue]." Consultant Dr. Stephen Radentz, a forensic pathologist, agreed with those conclusions, and added that Glisson suffered from acute renal failure with hyperkalemia (*i.e.* too much potassium in the blood), dehydration and volume depletion, acute respiratory insufficiency or pneumonia, and altered mental status. Finally, for purposes of this litigation, Glisson's estate retained Diane Sommer, M.D., who prepared a report finding "[w]ithin a high degree of medical certainty … that the health care [Glisson] received through out [*sic*] his brief incarceration lead [*sic*] to his early death."

No one disputes that Glisson's health was poor before he went to prison. He had been diagnosed with laryngeal cancer in 2003. In October of that year, he had radical surgery in which his larynx and part of his pharynx were removed, along with portions of his mandible (jawbone) and several teeth. He was left with a permanent stoma (that is, an opening in his throat), into which a tracheostomy tube was normally inserted. He needed a voice prosthesis to speak. Over the years, Glisson had additional treatments. Importantly for our case, the 2003 surgery and follow-up radiation left his neck too weak to support his head; this in turn made his head slump forward in a way that impeded his breathing. Because physical therapy and medication for this condition were ineffective, he wore a neck brace. He also developed cervical spine damage.

In 2008 doctors placed a gastrojejunostomy tube in his upper abdomen for supplemental feeding. Finally, there was some evidence of cognitive decline.

Despite all this, Glisson was able to care for himself in the home. He learned to clean and suction his stoma independently. With occasional help from his mother, he was able to use his feeding tube when necessary. He was still able to swallow well enough to take his food and other supplements by mouth most of the time. His hygiene was fine, and he helped with household chores such as mowing the lawn, cleaning, cooking, and caring for his brother.

The events leading up to Glisson's death began when a friend, acting as a confidential informant for the police, convinced Glisson to give the friend a prescription painkiller. Glisson was charged and convicted for this infraction, and on August 31, 2010, he was sentenced to a period of incarceration and transferred to the Wayne County Jail. Before sentencing, Dr. Borrowdale, one of his physicians, wrote a letter to the court expressing serious concern about Glisson's ability to manage in a prison setting. Dr. Borrowdale noted Glisson's severe disabilities from cancer and from alcohol dependence, his difficulty speaking because of the laryngectomy, his trouble swallowing, his severe curvature of the spine (kyphosis), and his problems walking. The conclusion of the letter was prophetic: "This patient is severely disabled, and I do not feel that he would survive if he was incarcerated." Dr. Fisher, another of Glisson's physicians, also warned that Glisson "would not do well if incarcerated."

Glisson's family brought his essential supplies to the Wayne County Jail, including his neck brace and the suction machine, mirror, and light that he used for his tracheostomy.

When he was transferred on September 3 to INDOC's Reception Diagnostic Center, the Jail sent along his mirror, light, and neck brace, but it is unclear what happened to these items. Glisson never received the neck brace while he was at Plainfield, nor was he given a replacement.

At the Diagnostic Center, Nurse Tim Sanford assessed Glisson's condition, accurately as far as one can tell. Sanford recorded Glisson's account of his medication regimen, and noted that Glisson appeared to be alert and able to communicate. Sanford noted that Glisson had a tracheostomy that had to be suctioned six times a day, and that Glisson had a feeding tube but that he took food through it only when he had difficulty swallowing. After that evaluation, Glisson was placed in the general population.

From this point on, Glisson's care began to resemble the blind men's description of the elephant. Different people took steps that were never coordinated or supervised by a single responsible medical provider. No provider furnished a comprehensive investigation of his medical condition. On September 5, staff reported that Glisson was angry and throwing candy out of his cell. (Glisson disputes this, and so this fact cannot be taken as established for summary judgment purposes.) Nurse Rachel Johnson tried to take his blood pressure, but could not. She recorded a pulse of 60 and an oxygen saturation level of 84%, which was low. (The record includes evidence indicating that normal oxygen saturation ranges between 95 and 100%; saturation below 90% is a sign of respiratory distress.) Some staff thought that Glisson seemed confused, but Johnson found him to be alert and oriented. The staff told her that Glisson had consumed only milk in the past two days and that he was not cooperat-

ing with their efforts to handcuff him for a clinic visit. They tested his oxygen saturation again and found it to be fluctuating between 84% and 94%. At that point, they took him to the clinic and allowed him to use his suction machine. Also, for reasons that are largely unclear, they identified him as a suicide risk and transferred him to segregation.

Glisson's care over the next couple of weeks was disjointed: no provider developed a medical treatment plan, and thus no one was able to check Glisson's progress against any such plan. In fact, for his first 24 days in INDOC custody, no Corizon provider even reviewed his medical history. Dr. Gallien requested his medical history on September 10. But there is no evidence that anyone responded to his request, and no one followed up on that request until September 27, when Dr. Malaka G. Hermina asked for the records and received them within several hours. Except for one instance on September 10, no Corizon provider ever tried to contact Glisson's mother or any other relative for information. During this time, Glisson's oxygen saturation rate bounced up and down, occasionally reaching troubling lows: On September 5 it fluctuated between 84% and 94%; it rose to 96% when he was allowed to use his suction machine; it sank back to 86% on September 6 before suctioning restored it to 94%; it was back down at 84% on September 8, and so on. Glisson's weight, never high, was also deteriorating. On September 9 a psychiatrist, Dr. Conant, recorded that he had lost weight; later that day a nurse practitioner ordered that Glisson be given the nutritional supplement Ensure. No one kept any daily account of how much—if any—Ensure Glisson consumed.

When Glisson was transferred from the holding facility to Plainfield on September 17, 2010, he weighed 119 pounds. There is no record of anyone's monitoring his weight, although on September 27 Dr. Hermina noted that Glisson appeared cachectic, which means undernourished to the point that the person has physical wasting and loss of weight and muscle mass. See MedicineNet.com, Definition of Cachectic, http://www.medicinenet.com/script/main/art.asp?articlekey= 40464. Dr. Hermina ordered a second nutritional supplement, Jevity, but he did not make any recording of Glisson's weight. As noted above, the coroner also noted Glisson's emaciation.

During this time, Glisson's mental status was also deteriorating. Dr. Sommer's report charts that process and notes at various points how the deterioration could have been halted if a qualified medical professional had been evaluating the full picture. Such an evaluation would have shown, Dr. Sommer said, a clear correlation between Glisson's underlying medical problems and his mental state. Her report comments on the drugs Glisson was taking. He was switched from Effexor to Prozac without any evaluation; worse, he was not monitored or weaned off Effexor while the Prozac was started. The two drugs work quite differently, the report notes, and it concludes that "[t]his abrupt change in medication contributed to [Glisson's] decline in function."

While Glisson was in custody, he had numerous episodes of altered mental status. Despite this fact, Dr. Gallien (again operating on the basis of incomplete information) noted on September 10 that Glisson had "no real mental health issues." Yet at roughly the same time, Health Services Administrator Kelly Kurtz called Glisson's mother to ask whether

he had any abnormal behavioral issues, such as spitting on the floor. Alma Glisson said no. There is no record that Kurtz told anyone about this, or that any Corizon provider could or did take this information into account in structuring Glisson's treatment.

Dr. Conant did conduct a mental health evaluation on Glisson on September 23. His findings were worrying, but no one connected them with any of the physical data on file, such as Glisson's tendency to have inadequate oxygen profusion and his cachexia. Dr. Conant found that Glisson was restless, paranoid, delusional, hallucinating, and insomniac. He placed Glisson under close observation and settled on a diagnosis of unspecified psychosis; he saw no need for medication. Had he looked, he would have seen that Glisson had no history of psychosis, and he might have considered (as the post-mortem experts did) the possibility that lack of oxygen and food was affecting Glisson's mental performance. Dr. Conant noted that he thought that Glisson's hallucinations were caused by morphine. This observation, too, was reached in an information vacuum. In fact, Glisson had been on narcotic medication for some time prior to his incarceration. Had Dr. Conant known of Glisson's medical history, he would have known that morphine was an unlikely cause and he would have looked further.

The Corizon providers never took any steps to integrate the growing body of evidence of Glisson's malnutrition with his overall mental and physical health. On September 4, Glisson's urinalysis results showed the presence of ketones and leukocytes. Dr. Sommer's report notes, without contradiction in the record, that "[k]etones suggest the presence of other medical conditions such as anorexia, starvation, acute

or severe illness and hyperthyroidism to name a few." "Leukocytes," it said, "are a sign of possible infection." The medical staff did nothing to address either potential problem, even though a second urine sample taken on September 5 showed an increase in ketones and leukocytes. There is no evidence in the record that a physician reviewed either of those lab results. That is so even though the record includes a note saying that on September 5 Glisson "had not been eating and seemed confused." Rather than probing the signs of infection and dehydration further, the staff opted to put Glisson in the psychiatric unit under suicide watch.

The blood work continued to raise red flags. On September 9, it came back with signs of abnormal renal function. Although Glisson met with Dr. Gallien the next day, no one looked at the bloodwork until September 27. At that point, Dr. Hermina ordered fasting labs for September 28. When the results were returned on September 29, they showed acute renal failure—information that prompted Dr. Hermina to send Glisson immediately to Wishard Hospital. A jury could easily conclude that Glisson was already slipping into renal distress as early as September 4 or 9, but that the uncoordinated care Corizon furnished allowed his condition to become acute. Recall that Dr. Radentz listed acute renal failure as a cause of his death.

Last, anyone with a good overall knowledge of Glisson's health problems would have realized that he was at high risk for aspiration pneumonia because he had undergone major surgery that had disrupted his swallowing mechanism, he had a stoma and feeding tube, and he had a cervical-spine problem that caused laxity in his neck. Whether or not his neck brace was transferred from the jail to the prison is be-

side the point: the record shows that he never received it, and it was not replaced. The only care he received for his neck and throat was suctioning, and then only after he was already hypoxic. Someone lost his voice prosthesis too. It was not replaced, despite the fact that there is evidence in the record to support a finding that its absence greatly increased the potential of aspiration and pneumonia, and that those were listed as contributing causes of death.

## II

It was not Alma Glisson's burden ultimately to convince the district court that Corizon's policy violates the Constitution; she needed only to show that there are genuine issues of material fact and that a rational jury could so conclude. In my view, the more complete account of the facts provided above leaves room for no other outcome. Two questions are critical: first, whether Corizon is automatically entitled to judgment if its staff committed no constitutional violation; and if the answer is no, then second, whether a jury could find that Corizon's failure to formulate protocols to guide care for chronically ill inmates violates the Eighth Amendment.

## A

There are two points on which I agree with my colleagues in the majority. We all accept that under the law as it presently exists, there is no *respondeat superior* liability in a case under section 1983 even for a private corporation such as Corizon. This court noted in *Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 789–96 (7th Cir. 2014), that there may be some question about that proposition, but we went no further, and so for now the applicability of *Monell*'s rule to

private entities such as Corizon remains established. In addition, we all understand that Glisson did not need to prove that the individual providers' care was deliberately indifferent in order to prevail. We squarely held in *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293 (7th Cir. 2010), that "we find unpersuasive the County's argument that it cannot be held liable under *Monell* because none of its employees were found to have violated [plaintiff's] constitutional rights." *Id.* at 304. Sometimes the nature of the constitutional violation, the theory of municipal liability, and the defenses will cause a *Monell* claim to fail because of the lack of any underlying violation, but sometimes it will not. Our case falls in the latter category. Individual medical providers may act within constitutional boundaries, both objectively and subjectively, but if there is an unconstitutional policy at the corporate level, the corporation must answer for it.

B

This takes me to the essence of my disagreement with the majority. My colleagues read Glisson's complaint as alleging only that it was Corizon's failure to implement INDOC's Health Care Service Directive that violated the Eighth Amendment, rather than as presenting a broader argument attacking Corizon's decision not to require centralized monitoring of inmates with complex medical conditions. Certainly if Corizon had implemented the state's Directive, quoted *ante* at 5, no policy would have stood in the way of adequate care for prisoners (such as Glisson) with chronic diseases. INDOC guidelines recognize the need for "planned care in a continuous fashion," and it is obvious that Glisson received nothing of the kind. My colleagues see this as a complaint about the *lack* of a policy, *ante* at 9, and they then conclude

that in this situation a plaintiff must present evidence of a series of incidents or a widespread practice constituting custom and usage. That is not Glisson's claim. Even if it were, I see no support for the final step of the majority's line of reasoning.

The Supreme Court's decision in *Los Angeles Cnty. v. Humphries*, 562 U.S. 29 (2010), unanimously reaffirms that the key holding of *Monell* is that a municipal policy or custom must be at stake, no matter what type of relief is sought. 562 U.S. at 31. *Monell*'s requirement of a policy or custom is meant to ensure that a municipality is held liable only in situations where its "*deliberate* conduct" is the "moving force" causing the injury—that is, the deprivation results "from the decisions of … those officials whose acts may fairly be said to be those of the municipality." *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 403–04 (1997) (emphasis in original).

The Court has enumerated several ways to demonstrate that the municipality's own conduct is at stake, not that of its employees or agents. First, it has held that "[l]ocal governing bodies ... can be sued directly under § 1983 ... where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Humphries*, 562 U.S. at 36 (quoting *Monell*, 436 U.S. at 690-91). A municipality can also be sued for "deprivations visited pursuant to governmental 'custom' even though such a custom *has not received formal approval* through the body's official decisionmaking channels." *Id.* (emphasis added).

In other words, either the content of an official policy, a decision by an official decisionmaker, or evidence of custom

will suffice. It is true that a plaintiff must show multiple in-cidents to prove a custom or practice that has not been "offi-cially adopted and promulgated." *Id.* But if she seeks to es-tablish municipal liability by either of the other two meth-ods—proving that the unconstitutional action resulted from a policy or a *decision* by the entity's "authorized deci-sionmakers"—she need not show multiple incidents. *Pem-baur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). In such cas-es, "the municipality is equally responsible whether that ac-tion is to be taken only once or to be taken repeatedly." *Id.*

The choice the majority has framed—written policy ver-sus lack of written policy—is therefore a false one. The ma-jority assumes that because Glisson attacks Corizon's failure to enact certain protocols, he is alleging the absence of a pol-icy. Not at all. Glisson alleges that Corizon had a deliberate policy that eschewed coordinated care: in essence, a policy not to have a policy and instead to rely on each provider's isolated decisions. And even if Glisson *were* alleging only the absence of a written policy, it does not follow that he must prove a custom. Glisson's allegations—and his evidence—fit comfortably within the "authorized decisionmaker" route, which does not require proof of multiple incidents. *Id.* No-where does Glisson allege that Corizon has an informal *cus-tom* of not creating a protocol for centralized treatment plans. He alleges instead that it made an affirmative, official *decision* not to do so. Policymakers make decisions to act and not to act; there is no reason why an official decision not to act should be any less culpable—or any less official—under section 1983 than one to act. Corizon was well aware of the INDOC Directive. After seven years, it is reasonable to infer that Corizon's decision not to enact the required protocols was deliberate and was made by persons within Corizon

with decisionmaking authority. (Indeed, it is hard to infer anything else.)

Even if Glisson's claim fits awkwardly into the methods mentioned in *Monell*, that is not a problem unless one reads *Monell* as providing an exhaustive, not an illustrative, list. But nothing in *Monell* or later cases supports such a mechanistic approach. *Monell*'s methods of proof are not ends; they are *means*. They suggest three paths to the same place: proof that "the municipal action was taken with the requisite degree of culpability." *Brown*, 520 U.S. at 404. *Monell* was about the conditions necessary to attribute conduct to the municipal "person" under section 1983: that is, whether the action in question can properly be considered the municipality's "deliberate conduct." *Id*. The harm itself—or the number of harms—is irrelevant for this purpose. Where there is strong evidence of official culpability—as there is in this case—a court need not worry about which path the plaintiff takes to proving that the municipality is culpable. What matters is that the proof point to the municipality's own act.

The essential prerequisite to deliberateness—and thereby culpability—is knowledge of the risk at issue. In policy-omission cases, it is the plaintiff's burden is to present "evidence that there is a true municipal policy at issue, not a random event." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). Such evidence is "necessary to understand what the omission means:" it could reflect nothing more than the municipality's ignorance of the problem's existence or gravity or its preference for another permissible course. *Id.* ("No government has, or could have, policies about virtually everything that might happen."). To be attributed to the municipality as a "policy," a course of action must be "consciously

chosen from among various alternatives;" therefore, evidence must "be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policymakers deliberately chose a ... program which would prove inadequate." *Id.* (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)). When they lack evidence from which a conscious choice can be inferred, plaintiffs may prove that the municipality had a custom or practice of dealing with incidents in a certain way; in other words, they may use circumstantial evidence to show an unspoken policy. Common sense says that one incident cannot constitute a custom. But where a plaintiff *does* present evidence from which the municipality's knowledge and choice can be inferred, there is no reason why proving multiple incidents should be necessary.

That is why we have stated that, where a municipal entity has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction." *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (alteration omitted) (quoting *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004)). It is why we have noted that a policymaker may be directly liable where he has actual knowledge of a risk but nonetheless ignores it. See *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) ("If the warden were aware of 'a systematic lapse in enforcement' of a policy critical to ensuring inmate safety, his 'failure to enforce the policy' could violate the Eighth Amendment.") (quoting *Goka v. Bobbitt*, 862 F.2d 646, 652 (7th Cir. 1988)). It is why we have held that where a situation calls for procedures, rules or regulations, the "failure to make a policy is also actionable." *Thomas*, 604 F.3d at 303 (citing *Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir. 1990)).

For the same reason, the Supreme Court has noted that even where there is *no* evidence of actual notice, deliberateness may be inferred where a risk is sufficiently obvious. For example, in its failure-to-train cases, the Court has said that where, "in light of the duties assigned to specific ... employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, … the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

Here, Glisson has presented evidence that supports a reasonable inference that Corizon made "a deliberate choice to follow a course of action … from among various alternatives," and therefore may be held liable as a municipality under section 1983. *Harris*, 489 U.S. at 389 (quoting *Pembaur*, 475 U.S. at 483–84 (plurality opinion)). The Indiana Department of Corrections saw fit to promulgate Health Care Services Directive 2.06 on "Chronic Disease Intervention Guidelines." The Guidelines say that "[e]ach facility must establish a site specific directive that guides the management of chronic disease management and clinics." They instruct that this directive should ensure that "[c]are provided to [inmates with chronic illnesses] should be organized and planned and should be consistent across facility lines." They add other essential criteria for the care of the chronically ill, including the need for an individualized treatment plan that includes objectives for care and is kept current.

This Directive squelches any possible argument Corizon might have about a lack of awareness of the risk of not having protocols for the care of inmates with chronic illnesses. Timing is not on Corizon's side either. *Seven years* after the

Directive appeared, Corizon had yet to make any policy change with regard to the comprehensive treatment of chronically ill inmates. In its responses to Glisson's interrogatories, Corizon admitted that it was aware of the Directive's existence and that it had done nothing to comply with its dictates. The most plausible inference—if not the only one—is that Corizon consciously chose, without medical justification, simply not to enact protocols for managing the care of these vulnerable inmates.

One does not need to be an expert to know that complex, chronic illness requires comprehensive and coordinated care. In *Harris*, the Court recognized that because it is a "moral certainty" that police officers "will be required to arrest fleeing felons," "the need to train officers in the constitutional limitations on the use of deadly force … can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." 489 U.S. at 390 n.10. It was just as certain that Corizon providers would be confronted with patients with chronic illnesses. The need to establish protocols for the coordinated care of chronic illnesses is obvious, just as is the recklessness exhibited by failing to do so. On the record here, a jury could reasonably find that Corizon's "policymakers were deliberately indifferent to the need" for such protocols, and that the absence of protocols caused Glisson's death. *Id.* at 390.

Indeed, it is not necessary to rely on the obviousness of these risks, because the Directive provided all the information Corizon needed. Through it, Corizon was "aware of 'a systematic lapse in enforcement' of the directive, a policy critical to ensuring inmate safety.'" *Steidl*, 151 F.3d at 741.

It had actual knowledge that, without protocols for coordinated, comprehensive treatment, the constitutional rights of chronically ill inmates would sometimes be violated, and nonetheless it "adopt[ed] a policy of inaction." *Kramer*, 680 F.3d at 1021. A jury could conclude that Corizon, indifferent to the serious risk such a course posed to chronically ill inmates, made "a deliberate choice to follow a course of action … from among various alternatives" to do nothing. *Harris*, 489 U.S. at 389. *Monell* requires no more.

In closing, it is important to stress that I am not arguing that the Constitution or any other source of federal law required Corizon to adopt the Directive or any other particular document. But the Constitution does require it to ensure that a well-recognized risk for a defined class of prisoners be competently addressed and not deliberately left to happenstance. Corizon had notice of the problems posed by a total lack of coordination. Yet despite that knowledge, it did nothing for more than seven years to address that risk. There is no magic number of injuries that must occur before its failure to act can be considered deliberately indifferent. See *Woodward v. Correctional Medical Services*, 368 F.3d 917, 929 (7th Cir. 2004) ("CMS does not get a 'one free suicide' pass.").

Nicholas Glisson may not have been destined to live a long life, but he was managing his difficult medical situation successfully until he fell into the hands of the Indiana prison system and its medical-care provider, Corizon. Forty-one days after he entered custody, he was dead. On this record, a jury could find that Corizon's obdurate failure to enact centralized treatment protocols for chronically ill inmates led

directly to his death. I would reverse the judgment below and remand for a trial.